IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOHN A. KOPPENAAL, | : | CIVIL ACTION NO. **1:CV-04-0957** |
| | : | |
| Plaintiff | : | (Judge Kane) |
| | : | |
| v. | : | (Magistrate Judge Blewitt) |
| | : | |
| JOANNE B. BARNHART, | : | |
| Commissioner of | : | |
| Social Security, | : | |
| | : | |
| Defendant | : | |

**REPORT AND RECOMMENDATION**

This is a Social Security disability case pursuant to 42 U.S.C. § 405(g), wherein the

Plaintiff, John A. Koppenaal, is seeking review of the decision of the Commissioner of Social

Security ("Commissioner") which denied his claim for Social Security Disability Insurance Benefits

("DIB") under Title II of the Social Security Act (Act), 42 U.S.C. §§ 401-433.

**I. PROCEDURAL HISTORY.**

The Plaintiff protectively filed an application for DIB on July 25, 2002, formally on

September 2, 2002, 9-2-02, alleging an inability to work since September 12, 2001, due to nerve

damage in his head and hearing loss in his left ear. (R. 11, 63). His claim was denied initially, and

a timely request for a hearing was filed. A hearing was conducted on October 9, 2003, before an

Administrative Law Judge. The Plaintiff was denied DIB pursuant to the Administrative Law Judge's

decision of November 8, 2003. (R. 11-20).

Plaintiff sought review of the Administrative Law Judge's decision by the Appeals Council. Said request was denied on March 19, 2004. (R. 4-6). Thus, the Administrative Law Judge's decision of November 8, 2003, became the "final decision" of the Commissioner.   That decision is the subject of this appeal.

The relevant time period of this case is September 12, 2001 (the alleged onset date )[1] through November 8, 2003(date of ALJ's decision).   (R. 12).

In compliance with the Procedural Order issued in this matter, the parties have filed briefs in support of their respective positions.   (Docs. 7 and 10).

## II. STANDARD OF REVIEW.

When reviewing the denial of Social Security DIB benefits, we must determine whether the denial is supported by substantial evidence.   *Brown v. Bowen*, 845 F.2d 1211, 1213 (3rd Cir. 1988); *Mason v. Shalala*, 994 F.2d 1058 (3rd Cir. 1993).   Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552 (1988); *Hartranft v. Apfel*, 181 F.3d 358, 360. (3d Cir. 1999).   It is less than a preponderance of the evidence but more than a mere scintilla.   *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

To receive disability benefits, the Plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a

---

[1]In his decision, the Administrative Law Judge found that the Plaintiff was insured for DIB from the alleged onset date  through the date of his decision.   (R. 19, ¶ 1.).

continuous period of not less than 12 months." 42 U.S.C. § 432(d)(1)(A).  (*See also* R. 12).

Furthermore,

[a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.  For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

## III. ELIGIBILITY EVALUATION PROCESS.

A five-step evaluation process is used to determine if a person is eligible for disability benefits.  *See* 20 C.F.R. § 404.1520 (1990).  *See also Plummer v. Apfel*, 186 F.3d 422, 428 (3d Cir. 1999).  If the Commissioner finds that a Plaintiff is disabled or not disabled at any point in the sequence, review does not proceed any further.   20 C.F.R. §§ 404.1520, 416.920 (1995).

The first step of the process requires the Plaintiff to establish that he has not engaged in "substantial gainful activity."  *See* C.F.R. §§ 404.1520(b), 416.920(b). The second step involves an evaluation of whether the Plaintiff has a severe impairment. *See* 20 C.F.R. §§ 404.1520(c), 416.920(c). The Commissioner must then determine whether the Plaintiff's impairment or combination of impairments meets or equals those listed in Appendix 1, Subpart P, Regulations No. 4.

If it is determined that the Plaintiff's impairment does not meet or equal a listed impairment, the Commissioner must continue with the sequential evaluation process and consider whether the Plaintiff establishes that he is unable to perform his past relevant work. *See* 20 C.F.R. § 404.1520(e), 416.920(e). The Plaintiff bears the burden of demonstrating an inability to return to his past relevant work. *Plummer*, 186 F.3d at 428. Then the burden of proceeding shifts to the Commissioner to demonstrate that other jobs exist in significant numbers in the national economy that the Plaintiff is able to perform, consistent with his medically determinable impairments, functional limitations, age, education and past work experience. 20 C.F.R. §§ 404.1520(f), 416.920(f). This is step five, and at this step, the Commissioner is to consider the Plaintiff's stated vocational factors. *Id.*

The Administrative Law Judge proceeded through each step of the sequential evaluation process and concluded that the Plaintiff was not disabled within the meaning of the Social Security Act. (R. 20). In reaching this determination, the Administrative Law Judge found that Plaintiff met the nondisability requirements for DIB of the Social Security Act. (R. 19). He next determined that the Plaintiff had not engaged in substantial gainful work activity since his alleged onset date (September 12, 2001). The ALJ found that Plaintiff had an unsuccessful work attempt in January/February, 2002. (R. 19). Further, the Administrative Law Judge determined that the medical evidence established that Plaintiff has status post left basilar skull fracture and cerebrospinal fluid leak and damage to his 8th cranial nerve, problems with post-concussion symptoms, hearing loss, depression and post-traumatic stress syndrome, impairments, considered in combination, that are severe within the meaning of the Regulations but not severe enough to meet or equal the

4

criteria for establishing disability under the listed impairments as set forth in Appendix 1, Subpart P, Regulations No. 4. (R. 19).

The Administrative Law Judge found Plaintiff's allegations regarding his limitations to be not totally credible. (R. 17). When assessing his residual functional capacity ("RFC"), the Administrative Law Judge found that Plaintiff retained the following residual functional capacity: he can perform unskilled light work[2] and sedentary work in which the work is one to three steps with no requirement to sit, stand, or walk for more than two (2) consecutive hours, with no work above the shoulder level, and work that does not require him to look up and down more than would be required in driving a car. The ALJ also found that the Plaintiff cannot drive or climb stairs or ladders. (R. 19).[3] The ALJ concluded that Plaintiff was unable to perform any of his past relevant

---

[2]     (b) *Light work.*   Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and puling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.  If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

 20 C.F.R. §404.1567 (b). (R. 18).

[3] In making a non-disability determination, the Commissioner is not required to consider Plaintiff's ability to travel. The only determination is whether Plaintiff has the ability to function in the work setting. There is not even a requirement that work be available in the immediate locality were Plaintiff resides or that there be work available which would accommodate a Plaintiff's limitations. 20 C.F.R. § 416.966(a). The regulations do mention transportation to and from work, but in the context of determining functional capability such as

work. (R. 19).  Thus, the Administrative Law Judge found that the Plaintiff met his burden in Step Four, and the inquiry moved to Step Five.

As discussed above, at Step Five, the Commissioner had the burden of demonstrating that the Plaintiff is capable of performing other jobs existing in significant numbers in the national economy.  20 C.F.R. §§ 404.1520(f), 416.920(f).  The final and fifth step requires an analysis of whether the Plaintiff, based on his age, experience, education, and residual functional capacity and limitations, can perform any other work in the national economy.  *See Plummer v. Apfel*, 186 F.3d at 428; *Burnett v. Comm. of SSA*, 220 F.3d 112, 126 (3d Cir. 2000).  Thus, at this step, the Commissioner must demonstrate that the Plaintiff is capable of performing other available work in order to deny a claim of disability.  20 C.F.R. § 404.1520(f); *Plummer*, 186 F.3d at 428.  In making a disability determination, the ALJ must analyze the cumulative effect of all of the Plaintiff's impairments.  20 C.F.R. § 404.1523; *Plummer, supra*.  Based on the testimony of an impartial vocational expert, the Administrative Law Judge concluded that, considering the Plaintiff's age, educational background, work experience, and residual functional capacity, he is capable of making a successful adjustment to work which exists in significant numbers in the national economy.  (R. 18).  Specifically, the vocational expert testified that a hypothetical individual with Plaintiff's background and restrictions could work as a hand assembler, sorter, visual inspector, and a surveillance system monitor.  (R. 18).  Thus, Plaintiff was found to be not disabled.  (R. 20).

───────────────

plaintiff's ability to sit, walk, or use public transportation. 20 C.F.R. Pt. 404, Subpart P, App. 1, § 1.00(b)(2).

## IV.  DISCUSSION.

### A.  Background

The Plaintiff was born on January 31, 1956, and was 47 years old at the time of the hearing before the ALJ. (R. 18, 40). The Plaintiff is a younger person under the regulations. (R. 19). *See* 20 C.F.R. § 404.1563. The Plaintiff completed a high school education. (R. 18, 19). The Plaintiff has not engaged in substantial gainful activity since September 12, 2001. (R. 19). The ALJ also found that the Plaintiff was unable to perform any of his past relevant work. (R. 19).

In his application for DIB which was formally filed on September 2, 2002, the Plaintiff alleged that he became disabled on September 12, 2001, and ceased working due to nerve damage to his head and loss of hearing in his left ear. (R. 11). The ALJ found that the Plaintiff had physical and mental impairments which, in combination, were severe. (R. 12, 19).

The ALJ also found that Plaintiff had a mental impairment that was severe and that it also limited him to unskilled work. (R. 17). The ALJ found that Plaintiff had a combination of impairments which were severe impairments. (R. 12, 19). However, the ALJ found that the Plaintiff did not have any physical or mental impairments, or combination thereof, which met or medically equaled any listed impairment. (R. 19). Specifically, the ALJ considered Listings 2.08 with respect to Plaintiff's hearing loss and Listing 11.18 with respect to Plaintiff's cerebral trauma. Listings 11.02, 11.03, 11.04 and 12.02 , with respect to his organic mental impairment, were considered. (R. 13). The ALJ also considered Listings 12.02 and 12.04 with respect to Plaintiff's depression[4], and 12.06

---

[4] Depression is a non-exertional limitation. *See* 20 C.F.R. §404.1569a.(c).

regarding Plaintiff's post-traumatic stress disorder, but found that the Plaintiff did not meet these Listings. (R. 13).

The ALJ found that the Plaintiff retained the residual functional capacity ("RFC") to perform unskilled light work and sedentary work, provided that it was exertionally and non-exertionally limited as stated above. (R. 14). The ALJ also found that the Plaintiff had limitations with respect to simple, one- to three-steps work and unskilled work. (R. 14). Finding that a significant number of such jobs exist in the national economy which the Plaintiff could perform, based on the testimony of a vocational expert, as mentioned above, the ALJ held that the Plaintiff was not disabled within the meaning of the Social Security Act. (R. 20).

The Plaintiff maintains on appeal that the ALJ's decision is not supported by substantial evidence in that: (1) the ALJ's determination that Plaintiff's condition did not meet or equal a listed impairment was not supported by substantial evidence; (2) the ALJ erred by misreading a medical source statement of his treating doctor; (3) the ALJ did not properly consider the Plaintiff's credibility; (4) the ALJ erred by disregarding the testimony of Plaintiff's VE (Calvin Anderson); (5) the hypothetical question to the VE was faulty and, as such, did not constitute substantial evidence; and (6) the ALJ erred by failing to consider the record that the Plaintiff lacked the ability to maintain competitive employment. (Doc. 7, pp. 4-5). These arguments will be addressed below.

### B.  Medical Evidence

The medical evidence indicates that Plaintiff suffered several injuries on September 12, 2001, when he was involved in a motor vehicle accident in which his tractor trailer was hit by a

8

train, including traumatic brain injury, basal skull fracture, depressed skull fracture, left cervical fracture, drainage from the cerebrospinal fluid (CFS leak), left ear laceration and rib fractures. (R. 115, 118, 120, 165).  Plaintiff remained hospitalized until October 4, 2001.  Plaintiff had persistent tinnitus and reduced hearing in his left ear.  (R. 166).  Plaintiff saw Dr. Costello, a neurosurgeon, on October 17, 2001, and Plaintiff's evaluation was unremarkable.  (R. 166).  Dr. Costello's impression was:

> Status post closed head injury with multiple traumas with a left basilar skull fracture of the temporal bone with associated CFS leak/otorrhea, which is resolving.  There is conductive hearing loss on the left, however, no evidence of facial nerve injury.

(R. 184).

Plaintiff's CFS leak was healing, and no surgical intervention was required.  Plaintiff had permanent left side hearing loss  but was a good candidate for amplification.   (R. 152).

On January 17, 2002, Dr. Costello found that Plaintiff was doing well and had no gross functional limitations.  Plaintiff was released to return to work the following week.  (R. 182). Cerebral testing, motor testing, strength testing and gait were all within normal limits.  (*Id*.).  Plaintiff had decreased hearing on the left side.

Thereafter, the Plaintiff tried to return to work as a truck driver for three weeks , but was not able to perform the job with the positional changes required.  (R. 180).  He then received worker's compensation benefits.  (R. 167).

On March 18, 2002, Dr. Costello's impression of Plaintiff was that he had persistent 8th nerve damage with positional vertigo, left hearing loss, and reactive depression.  (R. 180).  Dr. Costello's treatment plan called for Plaintiff's "permanent removal from work with complete activity

restrictions as functional limitations from unremitting 8th nerve injury are totally disabling." (*Id*.).

On June 12, 2002, Plaintiff was examined by Dr. Budusky, and the results were unremarkable. (R. 158). Dr. Budusky also completed a form for Plaintiff, indicating that he could work as a fishing guide, sitting in a boat or waterside, with no walking or carrying. (R. 158).

Plaintiff had a neuropsychological evaluation in August, 2002, by Michael Raymond, Ph.D. A mental status exam revealed normal orientation, reduced attention/concentration, depressed/frustrated mood, coherent/concrete thought process and mild impairment of word finding. (R. 164). Plaintiff denied suicidal ideation, and there was no evidence of formal thought disorder or psychosis. Plaintiff had no unusual perceptions. (R. 169). Dr. Raymond's impression was:

> Status-Post Multiple Trauma including a Traumatic Brain Injury secondary to a 9/12/01 Tractor Trailer/Train Accident
>
> Adjustment Disorder with Mixed Emotional Features (frustration, depression, somatic preoccupation, post traumatic stress)

(R. 173).

Dr. Raymond also found:

> At a functional level, Mr. Koppenaal remains independent in all activities of daily living (ADL). He has been able to participate in various household activities, socialize with family and friends, operates an automobile at short distances, and manages daily and monthly finances. He does experience ongoing post traumatic stress regarding traveling over railroad tracks.
>
> . . . . .
>
> Mr. Koppenaal's prognosis for further adaptive improvements appears fair to good, especially if his symptoms are treated

more effectively and he adheres to proposed medical/
neuropsychological recommendations.

(R. 173).

. . . . .

Mr. Koppenaal remains disabled from full time gainful
employment (Worker's Compensation). However, if the above
noted symptoms are treated more effectively, it is likely that
he will be able to return to some form of gainful employment.
This is based on relatively intact general intellectual and
memory abilities.

(R. 175).

Plaintiff was examined by Dr. Dhaduk, a neurologist, in January, 2003. Plaintiff's

neurological exam revealed as follows:

**MENTAL STATUS:** Patient is well awake and alert. He is
oriented to time, place and person. Speech is fluent No aphasia.
Other higher cortical functions are normal.

**CRANIAL NERVE EXAMINATION:** Pupils are equal and
reactive to light. No acute papilledema. EOMs are intact.
Lateral gaze mystagmus present bilaterally. No diplopia.
No filed defect. No facial asymmetry. Tongue is central.
Gag and corneal reflexes are present.

**MOTOR SYSTEM:** Motor strength is 5/5. No focal weakness.
No muscle twitching. No hemiparesis or paraparesis.

**DEEP TENDON REFLEXES:** Symmetrical. Babinski's sign is
negative.

**SENSORY:** No hemisensory deficit.

**GAIT AND STATION:**

Gait is minimally unsteady.

Romberg's test is negative.

11

Patient has mild difficulty in doing tandem walking.

(R. 222).

Dr. Dhaduk's impression was left basilar skull fracture with CSF leak and 8th nerve injury with post-traumatic vestibuloneuronitis. (R. 223). Dr. Dhaduk found that Plaintiff had a functional impairment that was "mild-to-moderately severe." (*Id*.). Dr. Dhaduk found that Plaintiff should try to do some type of office work with no repetitive movements of his head, flexion or extension, and that he could not return to work as a truck driver. (*Id*.). Dr. Dhaduk completed a physical capacities form in which he indicated that Plaintiff could perform full-time, light and sedentary work. (R. 225-226).

Dr. Morrow completed a psychiatric evaluation of Plaintiff on January 13, 2003. A mental status exam revealed, in part, as follows:

> Spontaneous fluent speech without paraphasias or aphasias.
> Affect is constricted. Moods are anxious and modestly depressed.
> Thought processes are linear and non-psychotic. There is no
> evidence of delusions, hallucinations or suicidal ideation. He
> does express feelings of helplessness but not hopelessness (BECK
> Depression Inventory taken 8/2002 by Dr. Raymond indicates
> a score of 22 putting him in the moderately depressed range.)
>
> . . . . .
>
> He is oriented times three. Concentration and attention span
> are diminished. Short-term memory slightly diminished.
> Long-term memory is intact.
>
> . . . . .
>
> Insight and judgment are fair.

(R. 238).

12

Plaintiff was diagnosed with major depression and post traumatic stress ("PTS") disorder with symptoms in the mild to moderate range. (*Id*.). Dr. Morrow opined that Plaintiff was "totally disabled from his work as a truck driver" due to neuropsychological injuries he suffered in his motor vehicle accident and his acoustic nerve dysfunction which produces dizziness. (*Id*.). Dr. Morrow felt that Plaintiff was not ready for vocational training at that time and that his depression and PTS disorder had to be more adequately addressed first. (R. 239). Dr. Morrow concluded:

> At this time, I cannot offer an opinion as to whether he has
> the potential to be retained in another area of employment.
> It is difficult to ascertain whether his neuropsychological
> deficits will stabilize, improve, or even deteriorate in the future.
> He will probably benefit from another assessment once his
> depression is adequately addressed.

(R. 239).

Dr. Morrow prescribed Wellbutrin for Plaintiff, and on March 12, 2003, he reported that Plaintiff felt a bit less depressed. (R. 235). In April, 2003, Plaintiff reported that his depression felt much improved. (*Id*.). Plaintiff continued to report dizziness and Antivert was prescribed. Celexa was also prescribed. Dr. Morrow encouraged Plaintiff "to keep an open mind about eventually getting some kind of work as he is too young just sitting around for the rest of his life doing nothing." (*Id*.). On May 16, 2003, Dr. Morrow noted that Plaintiff appeared "even more improved" and his moods were more buoyant. (R. 234). Plaintiff seemed to be coping with his dizziness better, even though the doctor did not think he was taking the Antivert.

On October 8, 2003, Dr. Morrow completed a mental impairment questionnaire. (R. 227-233). Plaintiff's current GAF was 70 and his highest GAF the past year was 70.[5] Plaintiff was found to have major depression and PTS disorder, 8th nerve damage and traumatic brain injury. (R. 227). Dr. Morrow indicated that Plaintiff had depressed, anxious mood, irritability decreased concentration, attention, shot term memory and math ability. (R. 228). Plaintiff's prognosis was fair. (R. 229). Dr. Morrow found that Plaintiff should be able to return to full work duty, "but he is disabled from work due to other factors." (Id.). Dr. Morrow noted that Plaintiff's depression and anxiety have a negative impact on Plaintiff's pain and perception of physical impairments. (R. 230). Dr. Morrow indicated that Plaintiff had pain but that it does not prevent him from functioning in daily activities or work and, that physical activity increases Plaintiff's pain but does not prevent him from functioning in work tasks. (R. 230). With respect to Plaintiff's mental abilities needed to do unskilled work, Dr. Morrow found that Plaintiff had very good to fair abilities in all categories listed. (R. 231). With respect to Plaintiff's functional limitations, Dr. Morrow found that Plaintiff had marked restriction of activities of daily living; slight to moderate difficulties in maintaining social functioning; frequent and constant deficiencies of concentration, persistence or pace resulting in

---

[5]A Global Assessment of Functioning ("GAF") score of 61 to 70 indicates:

**Some mild symptoms** (e.g., depressed mood and mild insomnia) **OR some difficulty in social, occupational, or school functioning** (e.g., occasional truancy, or theft within the household), **but generally functioning pretty well, has some meaningful interpersonal relationships.**

*Diagnostic and Statistical Manual of Mental Disorders 32* (4th Ed. 1994) ("DSM-IV").

failure to complete tasks in a timely manner (in work settings or elsewhere); and continual episodes of deterioration or decompensation in work or work-like settings which cause the individual to withdraw from that situation or to experience exacerbation of signs and symptoms (which may include deterioration of adaptive behaviors).  (R. 232).

Dr. Morrow found that Plaintiff's impairment would cause him to be absent form work more than three (3) times per month.  (R. 233).

The ALJ found that the Plaintiff did have the above stated impairments and that they were severe in combination.  However, the ALJ found that the medical records did not demonstrate that the Plaintiff met or equaled any Listing, considering his severe impairments either on their own or in combination, and the Plaintiff contests this finding of the ALJ. (R. 13, 19).[6]

### C. Analysis

#### 1. Consideration of Plaintiff's Severe Impairments

As his first argument, the Plaintiff contends that there was substantial evidence that he has severe impairments which should have been found to meet Listings 12.02 (Organic Mental Disorder), 12.04 (Affective Disorder, *i.e.* Depression) and 12.06 (PST Disorder) if the ALJ had properly considered a treating source statement.  (Doc. 7, pp. 4, 6).  Thus, Plaintiff claims that at step three, the ALJ erred.  As stated, the ALJ did consider each of the stated Listings with respect to the Plaintiff's impairments, brain injury, depression and PST disorder, but he found that the Plaintiff did not meet or equal any of these Listings.  (R. 13).  The ALJ found, as Plaintiff notes and agrees

---

[6]We note that the Plaintiff has the burden of proving that he meets all of the requirements for a listing.  *See Sullivan v. Zebley,* 493 U.S. 521, 530 (1990).

(Doc. 7, p. 7), that the Plaintiff met the A criteria for the stated Listings, but that he did not meet the B criteria. (R. 13). The Plaintiff contends that this latter finding of the ALJ is erroneous in light of Dr. Morrow's mentioned findings with respect to Plaintiff's marked and constant functional limitations from his mental impairments. (R. 232). As discussed above, Dr. Morrow found that Plaintiff had a marked degree of functional limitation for activities of daily living, frequent/constant functional limitation with respect to deficiencies of concentration, persistence or pace, and continual functional limitation regarding episodes of deterioration or decompensation. (*Id*.).

The Plaintiff argues that the ALJ did not discuss these findings of Dr. Morrow and does not make reference to Dr. Morrow's opinions in his (the ALJ's) decision that Plaintiff did not meet the B criteria. We thus construe Plaintiff as arguing that there was not substantial evidence to support the ALJ's finding that his impairments did not  meet or equal any listing. Plaintiff also seemingly contends that the ALJ's finding was inconsistent with his treating doctor's opinion (Dr. Morrow).

Specifically, the ALJ found as follows:

> [A] review of the "B" criteria reveals that the claimant does not exhibit the severity requirements of either Section 12.04, 12.06 or 12.02. In this respect, claimant has no more than a mild restriction of activities of daily living and social functioning. He has been able to attend to his own personal care and hygiene without any problems. Claimant has also been capable of helping with the household chores such as the cooking, vacuuming and taking out the trash (Exhibit 5F, page 10; Exhibit 3E, page 2). Further, the record shows that claimant has been caring for his mother who suffers from senile dementia (Exhibit 13F, page 11); and he has been able to hunt with a crossbow and a rifle. Also he has been able to socialize with his family and friends. (Exhibit 5F, page 10). He has moderate difficulties in maintaining concentration, persistence, or pace; but he has not had any

episodes of decompensation of an extended nature.  Further, none of the "C" criteria in either Section 12.02, 12.04 or 12.06, is present. Thus, a finding of disability cannot be made at step three of the sequential evaluation process.

(R. 13).

As the Defendant states in her Brief (Doc. 10, pp. 12-13), and as discussed above, the ALJ did, in fact, consider Dr. Morrow's opinions and findings with respect to Plaintiff's functional limitations from his mental impairments.  The ALJ found that these opinions of Dr. Morrow were totally inconsistent with the Plaintiff's above reported ability to perform unskilled work.  Thus, the ALJ rejected the mental functional limitations of Plaintiff which Dr. Morrow found.  (R. 16).  We find that the ALJ did consider the aforementioned evidence from all of Plaintiff's treating doctors in determining that Plaintiff did not meet the B criteria for the stated Listings.  (R. 14-16).  Thus, we find substantial evidence supports the ALJ's decision with respect to step three.

The Plaintiff also claims that the ALJ failed to attach a Psychiatric Review Technique Form ("PRTF") form to his decision regarding his finding that the Plaintiff did not meet the B criteria as was required.  (Doc. 7, pp. 8-9).  The Defendant correctly states (Doc. 10, p. 13) that the PRTF is no longer required and that the regulations provide that the ALJ must document his findings with respect to the Plaintiff's four areas of functional limitations, as he clearly did.  (R. 13).

The Plaintiff argues that the ALJ failed to include a PRTF as part of his decision.  (Doc. 7, pp. 8-9).  We find  that, as of September, 2000, there was no longer a requirement that the ALJ attach a PRTF to his decision.  65 C.F.R. § 50758.  The ALJ specifically evaluated the Plaintiff's mental functional limitations in accordance with the special technique described in 20 C.F.R. § 404.1520a. (R. 13).

20 C.F.R. § 404.1520a(c)(3) identifies four broad functional areas in which the ALJ is to rate the degree of a claimant's functional limitations: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. As discussed, the ALJ considered the Plaintiff's functional limitations in the four areas.  The ALJ's finding in these areas was supported by Dr. Dhaduk's finding that Plaintiff's functional impairment is only mild-to-moderately severe.  (R. 223).  We find, therefore, that the decision of the ALJ that the Plaintiff did not have a mental impairment that met or equaled any Listing is supported by substantial evidence.

2.    Consideration of medical source statement of Plaintiff's treating doctor

The Plaintiff next argues that the ALJ erred by misreading the medical source statement of his treating doctor.  In the fifth step, the Plaintiff claims that the ALJ did not meet his burden of showing that he had the RFC to perform substantial work existing in significant numbers in the national economy.  (Doc. 7, pp. 9-10).  Plaintiff states that Dr Morrow's opinion was that he did not have the mental ability to perform any work including unskilled work.  The Plaintiff claims that the ALJ misread Dr. Morrow's Mental Impairment Questionnaire by finding that the doctor in this form indicated that he (Plaintiff) had the ability to return to full work duty based on his mental status. (R. 16).  Plaintiff states that in light of this misreading of the doctor's finding, upon which the ALJ based his rejection of the doctor's opinion as to Plaintiff's decomposition, the ALJ erroneously found that he was not disabled from all work activities.  The Plaintiff contends that the doctor's response to Q 9 c.  (R. 229) related only to the effect that his medication had on his ability to work and that the ALJ took the statement out of context and used it to discredit the opinions of Dr. Morrow that he is disabled due to his mental and physical limitations.  (Doc. 7, p. 12).  The Plaintiff states that

18

the ALJ has misapplied this finding by Dr. Morrow to support his (ALJ's) conclusion that Dr. Morrow's assessment  found that "claimant has the ability to return to full work duty based on his mental status". (R. 16).[7]

The ALJ did consider the questionnaire Dr. Morrow completed.  The ALJ found that, based on the doctor's completion of the section on Plaintiff's mental abilities and aptitude to perform unskilled work, the doctor concluded that the Plaintiff can perform unskilled work. (R. 16, 231).  We also agree with the Defendant, that based on Dr. Morrow's own treatment notes from February, 2003, through May, 2003 (R. 234-235), discussed above, the Plaintiff's depression was improving.  The ALJ also found that the other factors to which Dr. Morrow referred in Question 9 c., such as his pain and physical impairments, were out of the doctor's area of expertise and could not be considered.  (R. 16).

It is also significant that on the mental impairment questionnaire form, Dr. Morrow indicated that Plaintiff's GAF was 70, which is consistent with only some mild depressed symptoms and only some difficulty in social functioning but generally functioning pretty well.  (R. 227). Further, Plaintiff's discussed daily activities were consistent with a GAF of 70.[8]

The ALJ correctly determined that Plaintiff's severe depression did not equal or meet any listing.  The Plaintiff takes medication for depression, but there were no records to show that this

---

[7]As indicated above, Dr. Morrow's prognosis of the Plaintiff was "fair" (R. 229) and Dr. Morrow's GAF rating of Plaintiff was 70 (R. 227).

[8]We also note that, in the questionnaire, Dr. Morrow found that Plaintiff had unlimited ability mental ability to perform unskilled work to maintain regular attendance and be punctual within customary usually strict tolerances. (R. 231).

mental impairment met or was equal to Listing 12.04 since it did not meet the B criteria, as the ALJ found. (R. 13). In his Brief, Plaintiff points to the questionnaire of Dr. Morrow to demonstrate that his depression met or equaled the B criteria of the listings. Plaintiff's treating doctor, Dr. Morrow, noted in March, 2003, that Plaintiff felt less depressed on Wellbutrin (R. 235) and in April, 2003, the doctor noted that Plaintiff was feeling much improved regarding his depression. (R. 235). In May, 2003, Plaintiff's depression was even more improved. (R. 234). As stated, the Plaintiff was started on Wellbutrin and his depression was improving. There are no medical records mentioned by Plaintiff in his Brief to show any more problems with depression or that his condition worsened. Dr. Dhaduk's stated findings do not show Plaintiff met or equaled any listing for mental impairments. (R. 222). The Plaintiff had no episodes of deterioration, other than Dr. Morrow's note that Plaintiff tried to return to work (as a truck driver) but was not able to do it. (R. 232). However, it is undisputed in this case that Plaintiff could not perform his past relevant work as a truck driver. The record also supported the ALJ's findings of only mild to moderate functional limitations, including Dr. Raymond's findings and Dr. Morrow's own GAF score of 70. (R. 13, 173, 227). Dr. Raymond also found that Plaintiff's excessive daily caffeine intake may contribute to his depression, irritability and reduced attention/concentration. (R. 174). Thus, Plaintiff's depression, which was severe combined with his other impairments, did not meet or equal listing 12.04, as the ALJ found.

The ALJ also properly determined the Plaintiff's RFC. (R. 13-14). Residual functional capacity is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." *Burnett*, 220 F. 3d at 121. (Citations omitted). In this case, the ALJ

determined that, despite his physical and mental impairments which in combination are severe, the Plaintiff did have the RFC to perform unskilled light and sedentary work with restrictions. (R. 14).

The Court in *Burnett*, 220 F. 3d at 121, stated that the ALJ must consider all evidence before him in making a RFC determination. The *Burnett* Court further stated that, while the ALJ is permitted to weigh the credibility of the evidence, he is required to give some indication of the evidence which he rejects, as well as the reasons for discounting the evidence. *Id*. Thus, the ALJ must mention and refute some of the contradictory medical evidence before him. *Id*. *See also Adorn v. Shalala*, 40 F. 3d 43, 48 (3d Cir. 1994). We find that, in this case, the ALJ considered all of the medical evidence before him, and he mentioned and refuted some of the contradictory evidence, such as Dr. Morrow's opinion. (R. 16).

The ALJ did give weight to Plaintiff's testimony regarding his allegations. (R. 17). In fact, the ALJ reduced his RFC finding in order to address Plaintiff's claims of his post-concussion symptoms and psychological conditions by limiting him to work that is one-to-three steps with no requirement to sit, stand or walk for more than two consecutive hours, with no work above shoulder level, and does not require him to look up and down more than would be required in driving an automobile; but driving and climbing stairs or ladders would be precluded. (R. 17). These restrictions were consistent with Dr. Morrow's assessment of Plaintiff's mental abilities to perform unskilled work as well as Dr. Morrow's GAF score of 70. (R. 227, 231). The ALJ also found that Plaintiff could not perform his past work. (R. 17).

The ALJ's RFC finding was supported by the medical record of Plaintiff and was consistent with the records of Plaintiff's treating physicians, Dr. Morrow and Dr. Raymond, as well

as Plaintiff's Daily Activities Questionnaire in which he indicated that he cares for his mother, he performs his own personal care, he drives a car, takes out the trash, prepares meals, shops and vacuums, he can climb 25 steps, walk ½ mile, and lift and carry 25-30 pounds.  (R. 75- 78 ).  The Plaintiff indicated that he can start and complete projects such as reading and doing a puzzle, but he forgets what to finish.  (R. 79).  The Plaintiff did not take pain medication, and his pain did not affect his ability to think and concentrate.  (R. 83).

Moreover, the Plaintiff does not point to any medical records which indicated he had non-exertional limitations to the extent found by Dr. Morrow.  (R. 232).[9]  Plaintiff's depression was reasonably under control and stable.  (R. 234-235).  Plaintiff himself did not report functional limitations to the extent found by  his treating doctor, Dr. Morrow (R. 232), according to his notes. Dr. Morrow consistently reported improvement in Plaintiff's condition through May, 2003.

The objective medical evidence, taken as a whole, supports the ALJ's RFC determination in this case.  Although the ALJ found that the Plaintiff had impairments which were severe in combination due to his physical as well as mental impairments, the objective medical evidence demonstrated that the Plaintiff had the requisite ability and exertional and non-exertional capacity to perform unskilled light and sedentary work.

Thus, we find that the ALJ evaluated all of the medical evidence and that his finding that the Plaintiff could perform unskilled light and sedentary work was supported by substantial evidence.

---

[9]Further, it is the ALJ's determination as to whether the Plaintiff is disabled, and not Dr. Brolan's.  *Adorno. v. Shalala,* 40 F. 3d 43 (3d Cir. 1994).

### 3.  Plaintiff's Credibility

The Plaintiff argues that the ALJ's credibility findings about him were not supported by the opinions of his treating doctors and the medical evidence and,  thus was not supported by substantial evidence.  (*Id*. Doc. 7 at pp. 14-15).  Defendant states that the ALJ correctly evaluated the Plaintiff's subjective complaints.

The ALJ found that the Plaintiff was not entirely credible.  (R. 17).  The ALJ did accurately state the Plaintiff's daily activities pursuant to his testimony and his stated Daily Activities Questionnaire ("DAQ").  (R. 17).

In his testimony, as the ALJ found, and in his DAQ, Plaintiff stated that he  did household chores, that he cared for his children and mother, and that he drove and went hunting with a crossbow and rifle.  (*Id*.).  The Plaintiff's mental condition  was found to be improving by Dr. Morrow after Wellbutrin was prescribed  in March, 2003, and in April of 2003.  (R. 234-235).  Dr. Morrow also noted more improvement in Plaintiff's condition in May, 2003.  (R. 234).   Thus, as the ALJ found, the objective medical evidence, Dr. Morrow's own treatment records, as well as the record as a whole, including the Plaintiff's daily activities, did not fully support Plaintiff's testimony regarding the severity of his limitations.

The Plaintiff's daily activities can provide evidence of his symptoms and their effects on his ability to work.  *See* 20 C.F.R. § 404.1529(c)(3)(i).  The ALJ properly considered the Plaintiff's activities of daily living.  (R. 17).

Therefore, we find no error in the ALJ's consideration of Plaintiff's credibility.  *See Casias v. HHS*, 933 F. 2d 799, 801 (10th Cir. 1991) ("We defer to the ALJ as trier of fact, the individual

optimally positioned to observe and assess witness credibility").   In the instant matter, the ALJ considered the Plaintiff's subjective complaints in light of the objective medical evidence of record and Plaintiff's own testimony concerning his  activities and determined that those symptoms did not preclude him from performing unskilled light and sedentary work.  A review of the Plaintiff's medical records, as discussed above, indicates that the Plaintiff did indeed experience pain and depression, but not to the disabling extent he alleged.

### 4.  Testimony of Vocational Expert.

As his next arguments, the Plaintiff claims that the ALJ failed to properly consider the testimony of the vocational experts, that he relied upon a faulty hypothetical question, and that he ignored evidence that Plaintiff could not perform competitive employment.  (Doc. 7, pp. 15-19).

The Plaintiff states that the ALJ erred by rejecting the testimony of his VE, Calvin Anderson, since the ALJ found Anderson's opinions were based on his interpretations of the medical evidence.  The Plaintiff argues that the ALJ failed to address the purely vocational opinions of VE Anderson which support a finding of disability, such as the amount of head movement required by the jobs identified by the other VE (Ms. Sagliocco) who testified at the hearing, and his opinion that Plaintiff would miss more than three (3) days of work per month which was based on Dr. Morrow's opinion in the Questionnaire.

The Defendant maintains that the ALJ included all of the restrictions that were supported by the record in his hypothetical question to the vocational expert ("VE").  (Doc. 10, p. 16).  We agree with Defendant.  In the hypothetical question which the ALJ posed to VE Sagliocco, he included the following restrictions:

> Now if I were to find that the claimant could perform light
> or sedentary work and/or sedentary work as you defined it, provide (sic)
> it was unskilled one to three step work.  Not requiring sitting, standing,
> or walking for more than 2 consecutive hours at any of those
> activities for more than two consecutive hours.  And not – does
> not require work above shoulder level, and does not require the
> worker to look up or down more than he would have to in
> driving an automobile.  However, work around dangerous
> machinery or driving an automobile, is a (sic) precluded as is stair and
> ladder climbing.

(R. 289).

The VE identified jobs which exist in significant numbers in the regional and state economy which a hypothetical person could perform with the stated restrictions.  (R. 290).  The ALJ included restrictions of work that would only require 3 steps in recognition of Plaintiff's decreased ability to concentrate and decreased attention, which was supported by Dr. Morrow's finding that Plaintiff could carry out short simple instructions.  (R. 231).  The ALJ also restricted the work for climbing and looking up and down  for Plaintiff's dizziness, and, as stated, reduced Plaintiff's RFC to simple 3 step and unskilled work due to Plaintiff's lessened concentration and attention.  The ALJ restricted the Plaintiff regarding his trouble with his shoulder he testified he had and climbing.  (R. 258-261).  The ALJ also found that Plaintiff would not be required to sit stand or walk for more than 2 consecutive hours in a work day, and this was a restriction included in his hypothetical question to the vocational expert.  (R. 289).

"A hypothetical question must reflect all of a claimant's impairments that are supported by the record; otherwise the question is deficient and the expert's answer to it cannot be considered substantial evidence." *Chrupcala v. Heckler*, 829 F. 2d 1269, 1276 (3d Cir. 1987).

25

As Plaintiff states, if the ALJ found his testimony credible, then he could not perform the jobs identified by the VE.  (R. 290).  (Doc. 7, p. 15).  However, as discussed above, and as Defendant states (Doc. 10, p. 17), the ALJ specifically found that the Plaintiff was not fully credible.  (R. 17).

The Plaintiff argues that conflicts exist between the testimony of VE Sagliocco and of his VE, Mr. Anderson, regarding the amount of head movement required by the jobs Sagliocco identified.  The ALJ did in fact consider the Plaintiff's restriction regarding the amount of head movement he was capable of in performing a job and found that he had to be limited by the amount of looking up and down that Plaintiff would have to do in driving a car.  (R. 289).  As stated, Plaintiff indicated in his DAQ that he could drive and that he had no changes as to how often and how far   he could drive.  (R. 76).  At the hearing, Plaintiff testified that he drives a car locally.  (R. 262).  The ALJ questioned Plaintiff about his ability to look up and own while driving a car due to dizziness, and Plaintiff stated that it is OK as long he does not have to look down as he would if he working on the car or checking its oil.  He said that "just to drive a vehicle where I'm sitting like this ... then it's okay.  As long as I'm not ... Like if I try to check the oil in my car, I would get dizzy."  (R. 263).  Thus, we find substantial evidence to support the ALJ's restriction included in his hypothetical question that Plaintiff's ability to look up and down was limited to the amount he would have to do in driving a car, and the ALJ's  reliance upon VE Sagliocco's testimony that there were jobs the hypothetical person could perform.  VE Sagliocco also testified that the amount of head movement required in the jobs she identified were consistent with the amount required when driving a car. (R. 292).  Thus, while the Plaintiff's VE testified that the jobs VE Sagliocco identified

did not require the same amount of head movement as driving a car, the ALJ accepted Sagliocco's testimony that they did.  Dr. Morrow's note from May, 2003, indicated that Plaintiff was coping better with his dizziness even thought the doctor did not think he was taking his Antivert medication for it, and that he was less anxious when driving.  (R. 234).  Since the ALJ accepted VE Sagliocco's testimony that the Plaintiff could perform the jobs she identified despite his head movement restriction, he made a credibility determination.   In fact, the ALJ found that VE Sagliocco's testimony was credible.  (R. 18).

The Plaintiff also claims that the ALJ erred in rejecting Mr. Anderson's testimony that the Plaintiff could not maintain competitive employment if he assumed Plaintiff had to be absent from work more than three (3) days a month, as Dr. Morrow indicated in his questionnaire.   (R. 294). However, in this same questionnaire, Dr. Morrow indicated that Plaintiff's mental ability to maintain regular attendance was unlimited or very good.  (R. 231).  There was other substantial evidence in the record discussed above, upon which the ALJ relied, that did not support a finding that Plaintiff would miss more than three (3) days of work per month.    While VE Anderson opined that the Plaintiff could not sustain a 40-hour work week on a full-time basis due to his physical limitations (R. 297), as the ALJ correctly found, this VE is not a medical source qualified to state physical limitations.  (R. 18).  *See* 20 C.F.R. §1527(d)(5).

Since there is substantial evidence of record to support the ALJ's finding that the Plaintiff is not disabled within the meaning of the Social Security Act, his decision should be upheld.

**V.  Recommendation**.

Based on the foregoing, it is respectfully recommended that the Plaintiff's appeal be denied.

**s/ Thomas M. Blewitt**
**THOMAS M. BLEWITT**
**United States Magistrate Judge**

**Dated: May 12, 2005**

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JOHN A. KOPPENAAL,            :          CIVIL ACTION NO. **1:CV-04-0957**
                             :
   Plaintiff              :           (Judge Kane)
                             :
v.                           :          (Magistrate Judge Blewitt)
                             :
JOANNE B. BARNHART,           :
Commissioner of              :
Social Security,             :
                             :
   Defendant              :

## NOTICE

    **NOTICE IS HEREBY GIVEN** that the undersigned has entered the foregoing

**Report and Recommendation** dated **May 12, 2005.**

    Any party may obtain a review of the Report and Recommendation pursuant to

Rule 72.3, which provides:

    Any party may object to a magistrate judge's proposed findings,
recommendations or report addressing a motion or matter described in
28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the
disposition of a prisoner case or a habeas corpus petition within ten (10)
days after being served with a copy thereof.  Such party shall file
with the clerk of court, and serve on the magistrate judge and all
parties, written objections which shall specifically identify the
portions of the proposed findings, recommendations or report to which
objection is made and the basis for such objections.  The briefing
requirements set forth in Local Rule 72.2 shall apply.  A judge shall
make a *de novo* determination of those portions of the report or
specified proposed findings or recommendations to which objection
is made and may accept, reject, or modify, in whole or in part, the findings
or recommendations made by the magistrate judge.  The judge, however,
need conduct a new hearing only in his or her discretion or where
required by law, and may consider the record developed before the

29

magistrate judge, making his or her own determination on the basis of that record.  The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

<u>**S/ Thomas M. Blewitt**</u>
**THOMAS M. BLEWITT**
**United States Magistrate Judge**

**Dated: May 12, 2005**